**In re ISLAND HELICOPTERS, INC., a New York Corporation, Debtor.**

**Bankruptcy No. 197–14835–353.**

United States Bankruptcy Court, E.D. New York.

Aug. 8, 1997.

---

Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, New York City by Rita D. Dumain, Kathleen J. Cahill, Edward F.X. Hart, Robin Green, for New York City Economic Development Corporation.

Shaw, Licitra, Esernio & Schwartz, P.C., Garden City, NY by J. Stanley Shaw, Sarah M. Keenan, Stuart I. Gordon, John H. Hall, Jr., for Debtor.

*DECISION ON MOTION BY NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION TO DISMISS CHAPTER 11 CASE OR, ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY*

JEROME FELLER, Bankruptcy Judge.

## INTRODUCTION AND SUMMARY

This Chapter 11 case represents yet another battle in a protracted war between the City of New York ("City") and Island Helicopters, Inc., a New York Corporation ("Debtor") and related entities ("Affiliates"). The turf at the heart of this conflict is a heliport owned by the City and located on 34th Street and the East River in the Borough of Manhattan, adjacent to the FDR Drive ("Heliport"). The Heliport is essentially a paved lot with space for helicopters to take off, land and park. It has no buildings or permanent structures other than some movable trailers, fencing, lights and an underground storage tank for aviation fuel. The New York City Economic Development Corporation is responsible, on behalf of the City, for administration of the Heliport ("EDC" or "City").

The Debtor has negligible assets, no employees, no net income and, other than the City, lists one creditor. However, the Debtor does occupy the Heliport as fixed based operator ("FBO"). As such, the Debtor maintains a continuous presence at the Heliport and has the exclusive right to pre-schedule takeoffs and landings of helicopter flights for helicopter companies wishing to utilize the Heliport. The Affiliates conduct many of these helicopter aerial navigations, such as sightseeing, charter and other commercial flights, and these entities are purported to be heavily dependent on the Debtor's position at the Heliport.

The Debtor's relationship with the City has its genesis in a 1973 lease with a predecessor agency of the EDC under which the Debtor first became FBO at the Heliport ("Lease"). This relationship has been marred by many years of bitter disputes involving failure of the Debtor to pay rent timely, special zoning permits, environmental impact statements, efforts by the City to limit or restrict operations at the Heliport and other matters. These disputes spawned extensive litigation, both in the federal and state courts. For the most part, the state court matters were in the nature of landlord-tenant litigation and led to numerous stipulations and agreements between the Debtor and the City.

Of particular significance are agreements, so ordered by the state court, by which the Debtor acknowledges that its interest in the Heliport terminated pre-petition, consents to a pre-petition eviction and promises to vacate the Heliport without seeking any judicial stay of its ouster. In an effort to implement these agreements, the City obtained and served upon the Debtor a 72–hour notice of eviction on April 29, 1997. Notwithstanding its so ordered state court agreements to the contrary, the Debtor moved in the federal court on May 1, 1997 to enjoin the City from evicting it from the Heliport. On that date, the federal court summarily rebuffed the Debtor and denied the request for injunctive relief with extraordinary alacrity. The following morning, May 2, 1997, the Debtor sought relief in the state court to stop the eviction, but withdrew such action the same day and filed a Chapter 11 petition.

The EDC now moves for dismissal of the Debtor's Chapter 11 petition or, in the alternative, to lift the automatic stay so that the City may evict the Debtor from the Heliport ("Motion"). The Debtor opposes the Motion and cross-moves for an injunction under 11 U.S.C. § 105(a) to permit it additional time to remain in possession of the Heliport as FBO ("Opposition" or "Cross–Motion"). The EDC replied to the Debtor's submissions and oral argument was heard on June 3, 1997.

We find no legal or other basis for the Debtor's continued possession of the Heliport. The Debtor's contention that the Lease is not a lease, but rather an "Operating Agreement" not only lacks veracity, but is irrelevant to the City's entitlement to possession of the Heliport. We further find the Debtor's Chapter 11 filing serves no bona fide reorganization purpose and is little more than a desperate legal stratagem in a two party dispute designed to delay and obstruct

the City in the recovery of its property. This Debtor is incapable of reorganization and has no property interest in the Heliport protectable in bankruptcy.

The day prior to the hearing on the EDC's Motion, Island Helicopters, Inc., a Delaware Corporation, ("IHI Delaware"), one of the Debtor's Affiliates also filed a Chapter 11 petition. IHI Delaware is a debtor in another pending Chapter 11 case in this Court. A previously confirmed plan of reorganization has not been consummated and no final decree has been entered. IHI Delaware's first Chapter 11 case remains open and since confirmation there has been activity in that case. The Debtor argues that the propriety of its Chapter 11 filing should not be viewed in isolation but in totality with its Affiliates, particularly IHI Delaware. We reject these contentions as having no basis and constituting a transparent ruse in a futile attempt to legitimate the intrinsic infirmities of the Debtor's Chapter 11 filing.

We refuse to consider the Debtor's silly arguments to the effect that the Chapter 11 filing was proper because it is being unfairly persecuted by the City for political purposes and because of such political persecution is entitled to continue its occupation of the Heliport.

Accordingly, and for the detailed reasons hereinafter set forth, the Motion is granted and the Debtor's Chapter 11 case is dismissed as having been filed in bad faith. The Debtor's Cross–Motion is devoid of merit and is denied.

## FACTUAL CONTEXT

The Debtor filed this Chapter 11 case on May 2, 1997 in order to forestall imminent eviction from the Heliport. Like most evictions, this one should have come as no surprise to the Debtor. For years, the Debtor's hold on the Heliport has deteriorated as a result of its many battles with the City. Mainly, but not entirely, these skirmishes were over the Debtor's nonpayment of rent and failure to obtain needed zoning permits or complete environmental studies.

### 1. *Chronology of Disputes Over Debtor's Interest as FBO of the Heliport*

The Lease which incepted the Debtor's status as FBO of the Heliport in 1973 expired initially in October of 1983, during the pendency of a dispute with the City over the Debtor's failure to pay rent. *Application of the City in Support of Motion ("Application")* ¶ 10. This dispute resulted in an unspecified state court lawsuit between the Debtor and the City, the first of several. The Debtor continued in possession of the Heliport as FBO without the benefit of a formal lease until October of 1985, when the dispute was seemingly resolved. *Id.* Pursuant to an Agreement executed in October of 1985, the Debtor agreed to remit to the City $179,120.00 in unpaid rent, promised to obtain a needed special zoning permit from the New York City Planning Commission authorizing operations at the Heliport ("Zoning Permit") and promised to complete the prerequisite environmental impact statement ("EIS") *Application* ¶ 10, Ex. D; *Affidavit of Peter McGann in Opposition to Motion ("McGann Aff.")* ¶ 20. In exchange for these promises, the City agreed to renew the Lease for a second term which would expire in October of 1993. *Application* ¶ 10, Ex. D. During this second term of the Lease, the Debtor was hardly a model tenant and its squabbles with the City continued unabated.

By 1989, the Debtor had accumulated over $336,000.00 in unpaid rent, had failed to obtain the Zoning Permit or complete the EIS, and breached a 1988 letter agreement which established a schedule for the repayment of the rent arrears. *Application* ¶ 11, Ex. E. That year, the Debtor entered into another letter agreement with the City which established a new repayment schedule and mandated the Debtor's continued pursuit of the Zoning Permit and EIS ("1989 Agreement"). *Id.* The City agreed in a contemporaneously executed "Memorandum of Understanding," that should the Debtor honor its promises contained in the 1989 Agreement, the City would grant an extension of the Lease term, due to expire on October 3, 1993, to October of 1995. *Id.* This truce did not endure.

The Debtor again became delinquent in its rent to the City and did not obtain the

Zoning Permit or EIS. *Application* ¶ 12. Thus, the previously contemplated extension of the Lease term never materialized. Instead, a letter agreement was entered into in April of 1993, pursuant to which the Debtor promised, among other things, to pay approximately $226,000.00 in rent arrears ("April 1993 Agreement"). *Application* ¶ 12, Ex. F; *McGann Aff.* ¶ 23, Ex. G. The Debtor also abdicated to the City responsibility for completing the EIS and obtaining the Zoning Permit, and promised to reimburse the City for expenses incurred thereby. *Application* ¶ 12, Ex. F; *McGann Aff.* ¶ 23, Ex. G. Should the Debtor comply with these promises, the City agreed to allow its continued possession of the Heliport and to support an extension of the City's occupancy of the Heliport as FBO after expiration of the Lease on October 3, 1993, to October of 1995. *Application* 12, Ex. F; *McGann Aff.* ¶ 23, Ex. G.

However, by July of 1993, the Debtor's compliance with the April 1993 Agreement was called into question. A "Notice of Termination and Lease Default" dated July 2, 1993 was served on the Debtor by the City. *Application* ¶ 13. This notice set in motion the gears of the Debtor's ultimate eviction from the Heliport. The Debtor counter-attacked with the commencement of a state court lawsuit against the City seeking, among other things, a judgment declaring that it had not defaulted under the terms of the Lease and April 1993 Agreement and enjoining the City from terminating its occupancy of the Heliport as FBO. *Id.* The City counterclaimed for a judgment of possession and damages. *Id.* This state court litigation resulted in yet another series of agreements.

The first stipulation which settled this litigation, dated January 10, 1994, and so ordered by the state court ("January 1994 Stipulation"), ultimately failed. In exchange for the Debtor's continued presence at the Heliport as FBO, the Debtor promised to make certain payments to the City and to turn over to the City possession of the Heliport on October 4, 1995. *Application* ¶ 13. As further assurance that it would comply with the turnover, the Debtor also consented to a judgment of possession and an order of eject-

ment enforceable on that date. *Id.* Clearly, the parties to this judicially endorsed agreement hoped for maintenance of the status quo until October 4, 1995, followed by termination of the Debtor's possession of the Heliport as FBO.

However, the Debtor and the City were unable to keep even this temporary peace. On July 1,1994, the Debtor was served by the City with a notice of default respecting the January 1994 Stipulation. *Application* ¶ 14. A further stipulation between the Debtor and the City, this one entered into in August of 1994 and so ordered by the state court, also failed to resolve matters. *Application* ¶ 14, Ex. G. The Debtor and the City then entered into a final series of agreements in what appears to be a focused effort to fundamentally and permanently recast and sever their relationship. All these agreements were so ordered by the state court and bear directly on the controversy at hand. The first of these agreements was entered into by the Debtor and the City on February 13, 1996 ("February 1996 Stipulation"). *Application* ¶ 15, Ex. H; *McGann Aff.* ¶ 25, Ex. I.

While earlier stipulations extended only the Debtor's occupancy of the Heliport to October of 1995 (the Lease expired according to its terms on October 3, 1993), now even the Debtor's occupancy of the Heliport was in jeopardy due to its continued disputes with the City. In an effort to maintain in this tenuous hold on the Heliport without the benefit of a formal lease, the Debtor agreed under the terms of February 1996 Stipulation, that the City "shall be entitled to the immediate possession of the Heliport on July 31, 1996", and consented to the execution and enforcement on that date of an "Order of Ejectment" and "Judgment of Possession" already signed by the state court in March of 1996. *Application* ¶ 15, Ex. H. at 4 (emphasis in original). The Debtor further agreed "not to commence any suit or proceeding or to make any motion nor bring any order to show cause to vacate the Judgement of Possession and Order of ejectment or stay the execution thereof." *Id.* The very purpose of these provisions is agreed to in the February 1996 Stipulation and stated to be "so that on *July 31, 1996,* [the Debtor] ... shall be

excluded and removed from possession of the Heliport." *Id.* (emphasis in original). Thus, the Debtor consented to termination of its occupancy of the Heliport on a date certain and, in exchange, the City allowed the Debtor an additional 5½ months of occupancy, until July 31, 1996.

The February 1996 Stipulation was amended in September of 1996, whereby the date of termination of the Debtor's occupancy of the Heliport was extended to December 31, 1996 ("September 1996 Stipulation"). *Application* ¶ 16–17, Ex. I, *McGann Aff.* ¶ 25, Ex. J. Otherwise, insofar as here pertinent, the parties reaffirmed all terms and conditions set forth in the February 1996 Stipulation including agreements not to invoke the judicial system to prevent termination of the occupancy, now extended to December 31, 1996. *Application* ¶ 18. The September 1996 Stipulation which, like the February 1996 Stipulation, was so ordered by the state court provides that:

"[The City] shall be entitled to the immediate possession of the 34th Street Heliport ("Heliport") on December 31, 1996 and [the Debtor] consent[s] to the execution and enforcement on that date of a Judgment of Possession, Order of Ejectment, and Warrant of Eviction which were signed by [the state court] on March 5, 1996 ... so that on December 31, 1996, [the Debtor] ... shall be excluded from possession of the Heliport. On December 31, 1996, the [City] shall also have and be entitled to present to the Sheriff for execution and enforcement, an Execution ... without any notice...."

*Application* Ex. I at 1–2. Thus, the Debtor obtained an additional six months of occupancy at the Heliport.

The December 31, 1996 deadline passed and the Debtor did not vacate. No further extensions were granted by the City. On January 10, 1997, the City notified the Debtor that its right to occupy the Heliport expired under the February 1996 Stipulation, as amended by the September 1996 Stipulation. *Application* ¶ 19, Ex. J; *McCann Aff.* Ex. K. The Debtor did not vacate the Heliport and on April 29, 1997, the sheriff served the Debtor with a 72–hour notice of eviction, *Application* ¶ 20, Ex. K; *McGann Aff.* ¶ 29.

## 2. *The Debtor's Other Disputes with the City*

The Lease and the Debtor's occupancy at the Heliport is not the only front in the Debtor's war with the City. For a number of years, the Debtor and the City have battled over Heliport operations and its impact on nearby residential communities. Contrary to the Debtor's assertions, however, this particular dispute has little relevance to the controversy at hand. Accordingly, we briefly address only some highlights.

In 1973, the Heliport was constructed in an area of Manhattan largely devoid of residential housing. *McGann Aff.* ¶ 39. Subsequently, various luxury residential towers were constructed nearby giving rise to complaints by residents about noise resulting from Heliport operations. *McGann Aff.* ¶ 40. This issue was addressed in the context of the disputes between the Debtor and the City that lead to the 1989 Agreement. The 1989 Agreement obliged the Debtor, in addition to becoming current on its rent arrears and continuing its pursuit of the Zoning Permit and EIS, to discontinue all takeoffs and landings between the hours of 11:00 p.m. and 7:00 a.m., except for emergency flights. *Application* ¶ 11, Ex. E. The Debtor, in the simultaneously executed "Memorandum of Understanding," agreed that these new hours of operation were reasonable. *Application* ¶ 11, Ex. E.

A dispute also flared up in the context of certain administrative action taken by the City. On March 6, 1996, the City Council of the City of New York ("City Council") enacted "Resolution 1558" which restricted continued operations at the Heliport. *McCann Aff.* ¶ 33, Ex. M. These restrictions included: further reductions in the hours of operation of the Heliport, including the elimination of Sunday operations after January 1, 1997, and Saturday operations after August 1, 1998; a 47 percent overall reduction in Heliport operations; prohibition of flights over certain areas of Manhattan; and a prohibition of certain types of helicopters from us-

ing the Heliport. *McGann Aff.* ¶¶ 33–34, Ex. M.

On August 1, 1996, the City issued a request for proposals ("RFP") from entities seeking to succeed the Debtor as FBO at the Heliport. *McGann Aff.* ¶ 36, Ex. N. The RFP required that submitted proposals comply with Resolution 1558 and the operating restrictions contained therein. *McGann Aff.* ¶ 36. The Debtor intended to submit a proposal along with National Helicopter Corporation of America ("National") the Debtor's parent corporation, in response to the RFP. *Id.*

In fact, National commenced another litigation, this time in the United States District Court for the Southern District of New York, seeking preliminary and permanent injunctive relief against the enforcement of Resolution 1558 on the grounds that, among other things, the resolution was unconstitutional. *McCann Aff.* ¶ 37. The matter was heard by the Honorable Sonya Sotomayor, United States District Court Judge who, in an opinion dated January 7, 1997, permanently enjoined the City from enforcement of the operating restrictions contained in Resolution 1558, except those limiting (but not eliminating) weekday and weekend hours of operation. *See National Helicopter Corp. v. City of New York,* 952 F.Supp. 1011 (S.D.N.Y. 1997). We are advised that an appeal is pending.

### 3. *The Debtor's Retreat to the Sanctuary of Chapter 11 and Related Matters*

On May 1, 1997, after service of the sheriff's 72–hour notice of eviction from the Heliport and notwithstanding prior promises not to seek a judicial stay of its ouster, the Debtor moved in the United States District Court for the Southern District of New York, again before Judge Sotomayor, for a temporary restraining order and preliminary injunction staying the City from completing the eviction. Application ¶ 21. The selection of this forum was not happenstance. Fresh off a relatively, favorable decision by Judge Sotomayor less than two months earlier in the dispute over Resolution 1558, the Debtor chose what it believed was a friendly forum. The Debtor was mistaken. The request for a

stay of the eviction was summarily denied from the bench by Judge Sotomayor on May 1, 1997. *Id.* Ex. A. Finding the Debtor's interest in the Heliport as FBO had terminated, an obviously troubled Judge Sotomayor ruled as follows:

> You are not going to get saved on the eviction. You are out. I saw the papers below. You have signed them. You are out ... I saw the notice of eviction. I saw the Stipulations. You are out. Under what conceivable theory should I enter a TRO stopping you from being evicted? Now, lets separate the eviction from use ... I never ruled, never intended to, don't intend to rule, that you have any right to stay at the [H]eliport as an *operator* ... You are evicted. You have no right to be there. My order never stopped that. You signed the stipulation and agreed to do it. I am not issuing the TRO ... I think you are judge shopping ... You were supposed to have been out of there months ago ... You agreed to leave on a date certain months ago. You have been there simply by forbearance ... I am denying the TRO for the reasons I have indicated.

*See Application* Ex A. (Transcript of Hearing before District Judge Sotomayor, dated May 1, 1997).

On May 2, 1997, the Debtor moved or a similar temporary restraining, order in the state court, the situs of the litigations with the City and the very court that had so ordered the February and September 1996 Stipulations. *Application* ¶ 22. Realizing that the selection of this forum may not have been the wisest choice, the Debtor withdrew its request within hours of its filing. *Id.* Instead, the Debtor filed a petition for reorganization under Chapter 11 of the Bankruptcy Code also on May 2, 1997, and thereby obtained a stay of eviction automatically.

On June 2, 1997, the day before the hearing on the Motion, IHI Delaware filed a new Chapter 11 case atop its still pending one. By June 9, 1997, a motion was filed to substantively consolidate the Debtor's and IHI Delaware's Chapter 11 cases.

#### 4. The Debtor's "Business"

Other than these disputes with the City, the Debtor has little else sustaining it. It has no operations as such. The Chapter 11 petition indicates that but for its alleged interest in the Heliport, a security deposit with the City, and some furniture and fixtures of nominal value, the Debtor is an assetless corporation. Cash is listed at $2,125.00. In fact, the Debtor lacked the resources to pay a retainer to its bankruptcy counsel. National came to the rescue and paid counsel $30,000.00 "as paying agent for the Debtor." *See Disclosure of Compensation of Attorney for Debtor,* filed June 6, 1997. The Debtor has no employees. Net operating income for the first thirty days after filing *is* projected by the Debtor at zero. The creditor body listed by the Debtor consists entirely of the City (whose claim it disputes) and one other entity.

### POSITIONS OF THE PARTIES

The City moves for dismissal of this bankruptcy case arguing that the Debtor's Chapter 11 petition was filed in bad faith and that the Debtor cannot effectuate a plan of reorganization. These contentions are grounded in the proposition that the Debtor has no legal or other right to continue in possession of the Heliport as FBO. The City asserts that this right of the Debtor terminated prepetition in accordance with the Debtor's state court, so-ordered stipulations, particularly the February and September 1996 Stipulations. Absent an interest in the Heliport, the Debtor by its own admission has nothing to reorganize. Thus, according to the City, the only purpose served by the Chapter 11 filing was delay of the City's enforcement of its right to evict the Debtor from the Heliport— an impermissible utilization of the reorganization process, warranting a finding of bad faith.

Not unexpectedly, the Debtor puts a decidedly different spin on the facts. Primarily, the Debtor contends that its interest in the Heliport as FBO is extant and in need of bankruptcy protection. This contention is supported by a legal argument that the lease which gave rise to this interest is really an "Operating Agreement" and therefore not subject to termination in the manner alleged by the City. The Debtor also raises other legal arguments predicated on the notion that the Lease is an "Operating Agreement."

Further, the Debtor asserts that its financial affairs are inextricably interwoven with the affairs of its Affiliates, particularly IHI Delaware. According to the Debtor, the businesses, assets and liabilities of the Affiliates should be considered in any analysis of the Debtor's reorganizability. Purported to be especially relevant are the business, assets and liabilities of IHI Delaware. The Debtor also argues that its eviction from the Heliport as FBO will have a devastating effect on its Affiliates, whose operations are heavily dependent on the Debtor and whose hundreds of employees will be without jobs should the Debtor be evicted.

Finally, the Debtor wrangles that it is being unfairly, persecuted by the City for political purposes. The Debtor contends that its eviction is simply an election year gambit motivated by a desire of the Mayor's office to appease local residents and cull votes. For these reasons, the Debtor argues that the City's motion should be denied or, at the very least, the Debtor's cross-motion for a stay of its eviction pursuant to 11 U.S.C. § 105(a) be granted, so that it may have time to relocate.

### APPLICABLE LEGAL PRINCIPLES

Although "Chapter 11 does not explicitly so state," it is well established that "bad faith may serve as a ground for dismissal of a bankruptcy petition." *Michigan Nat'l Bank v. Charfoos (In re Charfoos),* 979 F.2d 390, 392 (6th Cir.1992). *See also C–TC 9TH Ave. Partnership v. Norton Co. (In re C–TC 9TH Ave. Partnership),* 113 F.3d 1304 (2d Cir.1997); *Marsch v. Marsch (In re Marsch),* 36 F.3d 825 (9th Cir.1994); *Carolin Corp. v. Miller,* 886 F.2d 693 (4th Cir.1989); *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.),* 849 F.2d 1393 (11th Cir.1988); *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068 (5th Cir.1986). This principle is supported by the broad wording of 11 U.S.C. § 1112(b) which provides, in pertinent part, that the court "may

dismiss a case under this chapter ... *for cause,*" and sets out a non-exhaustive list of ten (10) circumstances which would demonstrate such "cause." *See Carolin Corp. v. Miller,* 886 F.2d at 698–99. Relevant legislative history and case law makes clear that in dismissing a Chapter 11 case "[t]he court will be able to consider other factors [than those enumerated in § 1112(b) ] as they arise, and to use its equitable powers to reach an appropriate result in individual cases." *Id.* at 699 (quoting H.R.Rep. No. 595, 95th Cong., 2d Sess. 406, reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6362); *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670, 674 (11th Cir.1984) (same). As we have previously recognized:

> [t]he precise perimeters of 'cause' are intentionally omitted from the statute so as to afford maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a Chapter 11 case for any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy reorganization process.

*In re HBA East, Inc.,* 87 B.R. 248, 258 (Bankr.E.D.N.Y.1988).

■ The Second Circuit Court of Appeals has recently aligned itself with every other Circuit in affirming the view that bad faith is subsumed within the penumbra of "cause" warranting dismissal of a Chapter 11 petition under § 1112(b). *In re C–TC 9th Ave. Partnership,* 113 F.3d at 1310–11. The Court stated "[t]he good faith standard applied to bankruptcy petitions 'furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy.'" 113 F.3d at 1310 (quoting *In re Little Creek Dev. Co.,* 779 F.2d at 1072). Accordingly, there is continued under the Bankruptcy Code in this Circuit and every other, a threshold standard of good faith which has been incorporated in every bankruptcy statute since 1898. *See In re Little Creek Dev. Co.,* 779 F.2d at 1071; *In re HBA East, Inc.,* 87 B.R. at 258. The good-faith requirement has long been the policing mechanism of bankruptcy courts to make certain that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy reorganization philosophy and for no other purpose. *See id.* at 258–59.

■ Bad faith is not a concept that lends itself to precise definition. *See In re Charfoos,* 979 F.2d at 393 ("[Bad] faith is an amorphous notion ....") (quoting *In re Okoreeh–Baah,* 836 F.2d 1030 (6th Cir.1988)). This court "may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of ... creditors to enforce their rights'" *In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394 (quoting *In re Albany Partners, Ltd.,* 749 F.2d at 674).

## ANALYSIS

■ This case is a classic manifestation of a Chapter 11 filing driven by purpose other than the legitimate aims and objectives of the statute. The case revolves entirely around a dispute over the Debtor's interest in continued possession of the Heliport as FBO. The sole purpose of the filing was to delay and frustrate termination of that interest which, after years of state court litigation and agreements with the City, had eroded to nothingness. Resort to Chapter 11 relief by the Debtor represents little more than a desperate and ill conceived litigation tactic necessitated by its unsuccessful attempt in federal district court, and unwillingness to return to the state court, to stay its eviction. The Debtor's eviction from the Heliport was fairly bargained for by the City, consented to by the Debtor, and judicially approved by the state court. The Debtor has no business to revive, reorganize or rehabilitate. Nor does the Debtor have creditors that need protection or assets to administer. While the Debtor and its counsel have gone great lengths to mask the aroma of a bad faith Chapter 11 filing, their efforts are unavailing.

Our conclusions in this regard flow primarily from the fact that the Debtor's interest in

continued possession of the Heliport as FBO terminated prepetition, and may not be resuscitated by a Chapter 11 filing. The Lease from which this interest germinated expired after its second term on October 3, 1993. The parties contemplated in 1988 and again in 1989 another extension of the Lease term on October 3, 1993 to October of 1995. However, as a result of continued disputes, the extension never materialized. Thus, beginning with the April 1993 Agreement, the Debtor and the City negotiated extensions of the Debtor's occupancy of the Heliport, absent a formal lease. This fundamental redefinition of the Debtor's rights was confirmed in the August 1994, and February and !September 1996 Stipulations, in which the Debtor specifically acknowledged that "the Lease expired by its terms on October 3, 1993." *Application* Ex. G at 3; Ex. H at 3.

In the February and September 1996 Stipulations, the City permitted the Debtor to remain in possession of the Heliport first until July 31, 1996, and then to December 31, 1996. In exchange for its continued occupancy, the Debtor promised to peaceably vacate the Heliport on a date certain, ultimately December 31, 1996. To ensure the promise to vacate the Heliport, the Debtor consented to a judgment of possession, order of ejectment and warrant of eviction, which the City could enforce after December 31, 1996, without notice. The Debtor promised not to seek any judicial intervention or a stay of the City's enforcement of its right to evict the Debtor from the Heliport.

Thus, when the December 31, 1996 deadline past, the Debtor's right to continue in possession of the Heliport terminated unequivocally. The Debtor was informed of this in writing by letter dated January 10, 1997. Thereafter, the Debtor continued in possession of the Heliport as FBO at the sufferance of the City. The City was free to enforce the judgment of possession, order ejectment and warrant of eviction at any time and without notice. It did so on April 29, 1997, With no other meaningful assets, no creditors and no business, the conclusion that this chapter 11 filing served no *bona fide* reorganization purpose is inescapable.

### 1. *Mission Impossible, Part I: Retain the Heliport*

Faced with these overwhelming facts, the Debtor sets forth a hodgepodge of purported legal and factual issues in a frenzied and ultimately unsuccessful effort to undermine the City's demonstration of bad faith. It does this mainly by attempting to conjure an interest in the Heliport as FBO which, it argues, continues to exist and warrants bankruptcy protection.

In support of this extraordinary assertion, the Debtor contends that the Lease is not a lease for real property and did not give rise to a landlord-tenant relationship, but is instead an "Operating Agreement." While the significance of this hypothesis is never intelligibly articulated by the Debtor in its submissions, the Debtor seems to believe that if its relationship to the City is reclassified as an "Operator" as opposed to that of a tenant of real property, the Court may conclude that its interest in the Heliport did not terminate and may now form the basis of a reorganization effort. We explain.

The Motion stresses that a warrant of eviction issued against the Debtor in accordance with the September 1996 Stipulation. Under New York Law, issuance of a warrant of eviction annuls any underlying landlord-tenant relationship. *See* N.Y. Real Prop. Acts Law § 749(3) (McKinney 1979). Where a prepetition warrant of eviction has issued against a debtor, the law is clear that the subject lease terminated prior to bankruptcy and cannot be resurrected by the bankruptcy court. *See, e.g., Bell v. Alden Owners, Inc.,* 199 B.R. 451, 458 (S.D.N.Y. 1996); *Bucknell Leasing Corp. v. Darwin (In re Darwin),* 22 B.R. 259, 262 (Bankr. E.D.N.Y.1982). Accordingly, a debtor remaining in possession of real property that is the subject of a prepetition warrant of eviction has merely a naked possessory interest which is wrongful, of minimal value to the estate and may not serve as the basis of a reoganization effort. *See generally, In re Neville,* 118 B.R. 14, 18 (Bankr.E.D.N.Y. 1990). Implicit in the Debtor's argument that the Lease is really an Operating Agreement is the fancy that the preceding legal principles apply only to leases of real proper-

**464**

ty. Thus, if the Debtor's interest in continued possession of the Heliport is not a real property interest, the Debtor's relationship with the City did not terminate prepetition when the warrant of eviction was issued. This notion opens the door to the Debtor's contention that it may remain in possession of the Heliport as FBO for a "reasonable" period, terminable only upon appropriate notice.

This effort to transform the Lease into an "Operating Agreement" fails to alter the stark reality that the Debtor had no cognizable property interest in the Heliport when it filed for reorganization under Chapter 11. In fact, the arguments that the Debtor's relationship to the City is not ill the nature of a real property tenant arc irrelevant to the Debtor's claimed interest in the Heliport. The property interest claimed by the Debtor, whether an interest in real property or something else, was contractual in nature and terminated prepetition.

▇▇▇▇ The filing of a bankruptcy petition does not "expand the debtor's rights against others more than they exist at the commencement of the case." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir.1984) Sess., *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787). Accordingly, "an executory contract or lease validly terminated prior to the institution of bankruptcy proceedings is not resurrected by the filing of a petition in bankruptcy, and cannot therefore be included among the debtor's assets." *Kopelman v. Halvajian (In re Triangle Labs., Inc.)*, 663 F.2d 463, 467–68 (3d Cir. 1981); *see also Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co. (In re Coast Cities Truck Sales, Inc.)*, 147 B.R. 674, 677 (D.N.J.1992) (holding "dealer agreement" terminated prepetition and may not be revived by the bankruptcy court); *Shell Oil Co. v. Anne Cara Oil Co. (In re Anne Cara Oil Co.)*, 32 B.R. 643, 647 (Bankr.D.Mass.1983) (holding that franchise agreement terminated prepetition and that "the bankruptcy court cannot create an interest for the debtor where none exists ").

When the Debtor filed its Chapter 11 petition, the source of its claimed right to possession of the Heliport as FBO was not the Lease, which expired on October 3, 1993, but independent and judicially endorsed stipulations and agreements with the City. At bottom, these stipulations and agreements were contracts between the Debtor and the City for continued occupancy of the Heliport. The last of these, the September 1996 Stipulation ended the Debtor's right to occupy the Heliport after December 31, 1996.

Redefining the subject matter of these contracts, i.e., the Debtor's continued occupancy of the Heliport, as something other than a real property interest is inconsequential. Clearly, it was the intent of the parties to these agreements that the interest terminate, and that the Debtor's occupancy of the Heliport expire, on December 31, 1996, long before the bankruptcy filing. In this connection, we are reminded of the often quoted words of the late Judge Schwartzberg, who stated:

> When a debtor's legal and equitable interests in property are terminated prior to the filing of the petition with the Bankruptcy Court that was intended to preserve the debtor's interest in such property, **the Bankruptcy Court cannot then cultivate rights where none can grow.**

*In re Butchman*, 4 B.R. 379, 381 (Bankr. S.D.N.Y.1980) (emphasis added). Here too, a bankruptcy filing cannot cultivate the Debtor's previously terminated right to possess the Heliport as FBO.

In truth, the Debtor cannot credibly argue that its interest in the Heliport was anything other than a real property interest terminable upon the issuance of a warrant of eviction, when it specifically agreed that its rights were subject to the state real property law. In the August 1994 and February 1996 Stipulations, the Debtor agreed that it "occupied the [Heliport] ever since [termination of the Lease] as month-to-month tenant[ ] as defined by Real Property Law ("RPL") § 232(a)." Application Ex. G at 3; Ex. H at 3. In both stipulations the Debtor also agreed that it had no rights in the Heliport "other than that of a month-to-month occupant pursuant to RPL § 232(a). . . ." Application Ex. C at 4, Ex. H at 4. These unequivocal agreements were reaffirmed in the

September 1996 Stipulation and conveniently forgotten by the Debtor in its submissions.

 Real Property Law § 232(a) enumerates the respective rights of landlords and tenants where a tenant occupies real property from month to month without a formal lease and the procedure by which a landlord may terminate such occupancy. N.Y. Real Prop. Law § 232(a) (McKinney 1989). The method of termination contemplated by this provision is a summary proceeding, which is the usual vehicle under state law by which aggrieved lessors recover possession of real property. *See* N.Y. Real Prop. Acts Law Art. 7 (McKinney 1979). The Debtor consented to a judgment of possession in favor of the City and warrant of eviction from the Heliport. A judgment of possession and warrant of eviction are the usual outcome of a successful summary proceeding. *See id.* §§ 747, 749. The issuance of the prepetition warrant of eviction terminated the Debtor's right to possession and the underlying contractual relationship.[1]

Apparently recognizing the weakness of its arguments that its interest in the Heliport did not terminate by agreement and/or issuance of a warrant of eviction on December 31, 1996, the Debtor spouts a further argument. The Debtor would have this court believe that there exists an implied contract between the Debtor and the City allowing the Debtor's continued occupancy of the Heliport beyond December 31, 1996.

This implied contract is claimed to have arisen from the Debtor's dealings with the City after December 31, 1996. The Debtor cannot deny that its right to remain in possession of the Heliport pursuant to the September 1996 Stipulation expired on that date. Now, it claims that the expiration of the four

month period before the City enforced its rights in late April 1997 gave rise to an implied contract and concomitant obligation of the City not to terminate the Debtor's possession of the Heliport absent reasonable notice. The Debtor asserts that the sheriff's 72–hour notice of eviction constitutes unreasonable notice.

 These contentions are without merit. The law is clear that "[a] contract cannot be implied in fact where it is against the declaration of the party to be charged or against the intention or understanding of the parties, or where the evidence is inconsistent with its existence." 7A Am.Jur.2d Contracts § 12 (1991); *see also Vantage Point, Inc. v. Parker Bros., Inc.,* 529 F.Supp. 1204, 1217 (E.D.N.Y.1981). The Debtor has introduced no evidence to prove its assertion that the City impliedly agreed to a modification of its bargained for agreements with the Debtor to obtain possession of the Heliport after December 31, 1996. The best the Debtor could do is to point to language in the first paragraph of the City's two-paragraph letter, dated January 10, 1997, indicating that City was "contemplating the possibility" of extending occupancy by a further amendment of the September 1996 Stipulation. *Application* Ex. J; *McCann* Aff. Ex. K. Disingenuously, the Debtor ignores the second paragraph of that same letter which reads as follows:

This is to notify you that none of the City's actions, including but not limited to, the City's participation in any such discussions and/or negotiations, and the City's action in retraining from exercising its rights under the [September 1996 Stipulation] to execute and enforce the Order of Ejectment and to take possession of the Heliport, should be understood as a manifesta-

1. As an aside and notwithstanding the Debtor's protestations to the contrary, we are convinced that the Lease which incepted the Debtor's relationship with the City was exactly what it purported to be, exactly what the state court thought it to be, and exactly what the parties have always intended it to be—a lease of real property. The test for determining what constitutes a lease under New York law is whether it was the manifest intent of identified parties to transfer control and possession of specified space, for a specified term, at an agreed upon rental. *See Davis v. Dinkins,* 206 A.D.2d 365, 613 N.Y.S.2d 933, 935

(2d Dep't 1994) (citations omitted); *See also Feder v. Caliguira,* 8 N.Y.2d 400, 404, 208 N.Y.S.2d 970, 972–73, 171 N.E.2d 316, 317–18 (1960); 74 N.Y.Jur.2d *Landlord and Tenant* § 9 (1988). *See generally* 49 Am.Jur.2d *Landlord and Tenant* § 23 (1995) ("[A] lease generally must contain the following essential terms: (1) the names of the parties; (2) a description of the demised realty; (3) a statement of the term of the lease; and (4) the rent or other consideration."). The Lease here clearly conformed to these requirements, as has been repeatedly acknowledged by the Debtor for decades.

tion of any intent by the City to waive, diminish or compromise any of the City's rights. The City expressly reserves its rights under the [September 1996 Stipulation].

*Application* Ex. J; *McGann Aff* Ex. K. We cannot conceive of a way in which the City could more clearly have expressed its intention not to enter into an implied contract with the Debtor or otherwise waive its rights in any way.

In sum, the Debtor's elaborate arguments that it has a protectable property interest in the Heliport are without foundation, both in fact and law. It is plain that this chapter 11 case was filed solely to delay and frustrate the City's contractual right to evict the Debtor from the Heliport in compliance with agreements, so ordered by the state court, which the Debtor no longer wants to live by. Such activity smacks of bad faith. *See, e.g., In re Charfoos*, 979 F.2d at 394 (bankruptcy case filed in bad faith after repeated noncompliance with state court orders); *Barclays–Am./Business Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broadcasting, Inc.)*, 871 F.2d 1023, 1027 (11th Cir.1989) bankruptcy case filed in bad faith by debtor "to get out of its bad deal").

### 2. Mission Impossible, Part II: Create Reorganization Requisites

Fundamental to any bona fide corporate reorganization effort under Chapter 11 of the Bankruptcy Code is that the entity seeking relief have assets, liabilities, creditors, employees and business operations. The Debtor acknowledges its lack of these elemental requirements and suggests that the Court look to its Affiliates to make up the deficiency. Specifically, we are urged to view the Debtor and its Affiliates as one entity, whose assets, liabilities and operations should be viewed as a whole in assessing the Debtor's reorganization effort, and to take into account the potentially harmful effect on the Affiliates which might result upon the Debtor's eviction from the Heliport. We are un-

able to accede to the Debtor's importunations.

The Debtor provides no legal precedent, and we are aware of none, that would support the proposition that a Chapter 11 petition filed by a corporation lacking Chapter 11 prerequisites may be maintained because dismissal will have a detrimental impact on unidentified corporations, or because these other corporations may have the missing prerequisites.[2] Indeed, "[r]esort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.' " *In re Little Creek Dev. Co.*, 779 F.2d at 1073.

> [T]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. [citation omitted] '[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre* . . .' [citation omitted].

*Id.* (quoting *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir.1985)). The Affiliates may not be employed to cure the improper filing by injecting reorganization requisites into the Debtor where none exists.

The Debtor supports its non-arguments with generalities and unsubstantiated statements. The Debtor states that the Affiliates have: i) substantial assets which are "intertwined" with the Debtor's "reorganization efforts"; ii) hundreds of employees; and iii) operations which generate over $13 million in annual revenue. *Debtor's Mem. in Opp'n to Motion* at 25. The Debtor proclaims that the continued viability of the Affiliates hinges on "Priority Operating Rights" at the Heliport accorded to the Affiliates by the Debtor, and that the Debtor's eviction could cause a cascade of bankruptcy filings by the Affiliates. *Id.* at 25–26. The Affiliates, assets, sources of revenue and employers whose em-

---

**2.** The Debtor does not specifically identify the Affiliates upon which it seeks to bottom the pro-

priety of its Chapter 11 filing.

ployees might lose their jobs are never identified or specified.

There is one Affiliate that is identified and which assumes a level of importance in the Debtor's opposition to the City's Motion, IHI Delaware. IHI Delaware and certain Affiliates, but not the Debtor, filed Chapter 11 petitions in 1984. A plan of reorganization was confirmed and the cases consolidated on June 20, 1989. This Chapter 11 case remains open. The confirmed plan of reorganization has not been consummated and no final decree has been entered. The Internal Revenue Service has pending a motion to convert the case to Chapter 7 because of post-petition tax delinquencies. In addition, the Federal Deposit Insurance Corporation has recently commenced an adversary proceeding to recover upon a defaulted secured loan obtained to fund the confirmed plan.

IHI Delaware filed its second Chapter 11 case on June 2, 1997, one day before the hearing on the City's Motion. Unlike the Debtor, IHI Delaware, a helicopter sightseeing operator, does have the indicia of a business. Apparently, IHI Delaware's Chapter 11 petition was filed hurriedly. The filing was unaccompanied by schedules and a statement of financial affairs. On June 9, 1997. one short week after IHI Delaware filed its Chapter 11 case, a motion was filed to substantively consolidate the Debtor's and IHI Delaware's Chapter 11 cases. IHI Delaware's schedules and statement of financial affairs were not filed until July 29, 1997.

 The Debtor does not deign to address the issue as to whether IHI Delaware can even maintain its second Chapter 11 case during the pendency of its earlier and still active first Chapter 11 case. *See generally In re Delaware Valley Broadcasters Ltd. Partnership,* 166 B.R. 36 (Bankr. D.Del.1994). Substantive consolidation "is no mere instrument of procedural convenience," as the Debtor would have us believe, "but a measure vitally affecting substantive rights," *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.),* 432 F.2d 1060, 1062 (2d Cir.1970), which should be "used sparingly." *Chemical Bank v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966). "Substantive consolidation usually results in, *inter*

*alia,* pooling the assets oil and claims against, the two entities; satisfying liabilities from the resultant common fund: eliminating inter-company claims: and combining the creditors of the two companies for purposes of voting on reorganization plans." *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),* 860 F.2d 515, 518 (2d Cir.1988).

A motion to substantively consolidate debtors in the infancy of Chapter 11 cases, and long prior to reorganization plan phases of such cases, is highly irregular. Moreover, an effort to substantively consolidate the Debtor, an entity with virtually no assets and one listed creditor other than the City, with IHI Delaware, an entity for which no meaningful financial information was available, is even more puzzling. In fact, the Debtor and IHI Delaware, in obtaining an adjournment of the hearing on the substantive consolidation motion acknowledge that such request was "premature". *See Application Seeking Adjournment of Debtor's Motion For Substantive Consolidation* ¶ 11. We can only conclude that the Debtor's strategic use of IHI Delaware is yet another tact in an arsenal of ploys to infuse legitimacy to its Chapter 11 filing.

### 3. Remaining "Issues"

In a final salvo, the Debtor lashes out at the City, charging that it is being unfairly persecuted for political purposes. Specifically, the Debtor contends that its eviction from the Heliport is motivated by the City's desire to replace it as FBO with an entity more responsive to the sensibilities of nearby residents. In this connection, the Debtor reminds us that these residents vote, and there is a upcoming mayoral election this fall.

The Debtor provides no support for the proposition that a Chapter 11 petition may be filed as a defensive litigation tactic in a political battle with the City. Further, this Court has not been made privy to any reason why the City, in an election year or otherwise, may not enforce its legal or contractual rights to terminate the Debtor's occupancy of the Heliport. Instead, the Debtor sprinkles the record with attacks on the integrity of

the Mayor's office. *See, e.g., McGann Aff.* ¶ 44 (alleging that the City's motivation in evicting the Debtor "is to pander to a donor to the mayoral election campaign."). The City, we think properly, did not dignify these outbursts with a response. Nor will we.

Finally, we address briefly the Debtor's request for a stay of its eviction pursuant to § 105(a) of the Bankruptcy Code. This Cross–Motion is premised on the plea that the Debtor is being forced to vacate the Heliport at the height of the flying season, and time is necessary to relocate so as to prevent disruption in the helicopter operations of the Affiliates. In addition, the Debtor claims it needs time to remove valuable fixtures located at the Heliport.[3]

The Debtor's Chapter 11 case warrants dismissal as not having been filed in good faith. Such a misuse of the bankruptcy court cannot serve as a jurisdictional predicate for the granting of injunctive relief. In any event, if the Debtor requires even more time to relocate, the predicament is of its own making. The Debtor has been on thin ice with the City for years. The ice broke December 31, 1996. The Debtor has been afforded plenty of time to relocate. To the extent the Debtor has a property interest in fixtures or improvements at the Heliport, these interests do not require the protection of the bankruptcy court. The City is subject to state law and may be held accountable for any violations thereof.

## CONCLUSION

Based on all the foregoing, including the forum shopping, timing of the chapter 11 filing, the dearth of assets or creditors, and the Debtor's inherent incapacity to reorganize, we find that the Debtor's Chapter 11 case was filed in bad faith in order to hang on to the Heliport, while at the same time impermissibly delaying and frustrating the City's enforcement of its legal and contractual rights. The Debtor's attempts to demonstrate *good* faith and reorganization potential are devoid of merit and indeed provide further evidence of the Debtor's bad Faith.

3. The Debtor's schedules place a value of $15,-000.00 on fixtures and furniture. Yet, the Debt-

 A good faith petition for bankruptcy reorganization must be filed with "an honest intent and genuine desire ... to use the statutory process to effect a plan of reorganization...." *In re Metropolitan Realty Corp.,* 433 F.2d 676, 678 (5th Cir.1970). A reorganization petition should not be used "merely as a device to serve some sinister or unworthy purpose." *Id.* The Debtor filed for Chapter 11 relief not because of financial distress, but because of legal distress arising from breached agreements and violations of court orders.

Our commercial system is anchored on stability of contract. The judicial system's need order and finality requires that orders of courts having jurisdiction to enter them are obeyed. To permit this reorganization case to continue is to render Chapter 11 a haven of repose to an entity oblivious to contractual commitments and court orders.

The City's Motion is granted and this Chapter 11 case is dismissed.

or's Opposition to the City's Motion makes reference to fixtures valued at $1 million.